RUTLAND TRANSIT CO. v. L. P. & J. A. SMITH CO.

(District Court, N. D. Ohio, E. D. January 24, 1912.)

No. 2,403.

NAVIGABLE WATERS (§ 26*)—OBSTRUCTION BY PIER CRIB UNDER CONSTRUCTION—INJURY TO VESSEL BY COLLISION—LIABILITY.

Evidence considered, in a suit by the owner of a steamer to recover damages for her injury by coming into collision with a stone crib being built by respondents as a government contractor in the harbor of Cleveland, when the steamer was entering the harbor at night, and *held* insufficient to sustain the burden resting on libelant to show that the injury arose through some fault or negligence of respondent, or even to show that the steamer struck the crib, rather than some other obstruction incident to the improvement work being carried on.

[Ed. Note.—For other cases, see Navigable Waters, Cent. Dig. §§ 133–166; Dec. Dig. § 26.*]

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

In Admiralty. Suit by the Rutland Transit Company, owner of the steamer F. H. Prince, against the L. P. & J. A. Smith Company. Decree for respondent.

Charles E. Kremer, of Chicago, Ill., Wallace, Butler & Brown, of New York City, and Hoyt, Dustin, Kelley, McKeehan & Andrews, of Cleveland, Ohio, for libelant and divers cargo interests.

Goulder, Day, White & Garry, of Cleveland, Ohio, for respondent.

DAY, Circuit Judge. This case arises by reason of a collision with the steamer F. H. Prince, while coming into the harbor at Cleveland, Ohio, on the 23d day of June, 1904.. It is contended by counsel for libelant that on this date this steamer, while laden with general merchandise, struck a crib filled with stone, located at the entrance of the harbor of Cleveland; that this crib was under the control of the L. P. & J. A. Smith Company, contractors engaged in the Cleveland harbor improvement; that the collision broke a hole through her beam planks, so that she began to fill with water and it became necessary to run her onto the beach to keep her from sinking in deep water.

Certain other parties on behalf of the cargo have intervened and rely upon the allegations of the libelant.

The question here arising being one of fault, it is not necessary to give further consideration to the other phases of this inquiry.

The damages to the cargo and the steamer arising out of the disaster amount to the sum of $110,000, and to recover this sum a libel was filed by the Rutland Transit Company, the owner of the Prince, against the L. P. & J. A. Smith Company, who, at the time I have indicated, were under contract with the United States government for the construction of two cribs at the mouth of the harbor at Cleveland. At the time of the collision they were putting in the crib which it is claimed the Prince struck. These cribs were the outer ends of piers which were to be 1,000 feet in length, and to extend out from the breakwater, which had already been constructed. Between these cribs and the breakwater more or less riprap stone had been deposited. Some of this riprap was placed around the east crib, which crib it is claimed the Prince struck. It appears from the testimony of the government engineer, which may be taken as reliable, that these cribs were sunk 1,000 feet out from the breakwater, at right angles to it. They were 700 feet apart; the top of the east crib, at the time of the collision, being 2½ feet below mean lake level. The crib was 60 feet by 60 feet, and was made of 12"x12" hemlock; the outer face being sheathed with 14-inch plank, maple and beech, down 16 or 18 feet, some of the hemlock (12"x12") being exposed below that. Parallel with the line of riprap work running along toward the breakwater were some floats on either side as guides to the vessels unloading the riprap stone. There was 22 feet of water over the riprap at the time. The west crib was sunk in the fall before the collision, and

the east crib in the month of June, 1904, I think some 8 or 10 days before the collision.

It is claimed by the libelant that the steamer F. H. Prince left Ogdensburg, N. Y., and this was her first trip of the season; that the Prince was of 240 feet keel, 42 feet beam, and tonnage of 1,547 tons; that at the time she struck she was drawing 6 feet 9 inches forward and 12 feet 6 inches of water aft. She struck at about 2:15 o'clock of the morning of June 23d. The captain described the striking in part as follows:

"We kept on going in this direction, and finally she struck something, and as she struck she keeled over to port, and it slewed her, shoved her off, and when she struck I stopped the engine and gave one whistle, and then started her again for fear that she would go around so far that she would hit aft. I gave her another whistle and started the engine, and told the wheelsman to steady, and he did so and went into the Cleveland harbor."

The captain also testified that he came in on a course of S. W. ³/₄ S. being on that course for half an hour, and that he was on that course when he struck, and that on that course he picked up the Cleveland fog signal, which is on the east end of the west breakwater, and this steamer was heading on it, and finally picked up the so-called jumping jack, or red and white flash light, and she was just about heading on it, her course then being S. W. ³/₄ S.

There is no dispute but that the west crib was lighted by a gas tank light, white in color, which was burning at the time of the collision, and that the east crib was lighted by a lantern some eight inches in diameter, with an oil pot which would hold an amount of oil which would burn this light for some eight days continuously, and that the light displayed was a red one. That these lights were burning there is no dispute. The weather was smoky, the government fog signals being sounded, and the Prince herself was sounding fog signals.

There is quite a serious conflict of testimony as to whether this red light was burning brightly or dimly; but that lights were maintained, and were burning, on both of these cribs under the control of the L. P. & J. A. Smith Company, there is no dispute.

It also appears that around these cribs there had been some stone placed, which came to within 8 feet or 9 feet from the top of them, and extended out from them a short distance. The Prince was going at a slow rate of speed. The captain was on the bridge, and this flash light, called the jumping jack light, was on the east end of the west breakwater. The captain testified that he knew nothing of the sinking of this east crib, or that it was to be sunk. It also appears that its existence was known to no one on board of the Prince. The only chart which the Prince carried was of an issue of 1864. It also appears from time to time that bulletins had been issued by the government mentioning the contemplated work on these cribs, and it further appears that the captain had never received any of these charts or bulletins. It is important to note that neither the captain nor any of the crew of the Prince state

that the Prince struck the crib. The captain says he struck something and keeled over to port. Then he says he saw a little dim red light on the starboard side a little past abreast. He does not give the distance, other than it looked to him to be about a width away, and then, in response to a question, says that he could have seen the light 300 or 400 feet, had he been looking for it. He also says he did not see the west crib light, which was an acetylene gaslight.

The government engineers and the government divers and surveyors, who were called as witnesses, all testified that the crib was in no way damaged or marked; that everything was intact. One fact is positive in this case, and that is that the crib bore no evidence of any sort of having been collided with. So it is evident from the testimony that the Prince did not strike the crib. On the other hand, it is positive that the Prince did strike something. She was not proceeding on the regular course, and the captain, on his examination, when asked how far the Prince was off the breakwater first, starts to say 500 or 600 feet, and then changed it to 1,000 feet. He also says he was running parallel with the breakwater, and then corrects himself, and says he was running so as to fetch up on the breakwater as she neared the entrance. He again admits that he did not know where he was, and I think perhaps the latter statement of the captain was perhaps a correct one, in view of his entire attitude in endeavoring to come into the harbor, of which he confessedly knew but little, with a chart on board not later than 1864, on a foggy night, without calling for the assistance of a tug or relying on other aids to navigation, other than his own instinct and limited knowledge of the harbor surroundings.

The captain of the Coffinberry, which came into the same port at the date of the collision, says he heard a steamer blowing off to the eastward and close to the breakwater. Now, Capt. Shay testified that he took out of the break in the Prince a certain piece of wood. He testified that in his opinion this wood was hemlock, and later admitted that he did not know much about timber. Later Capt. Benham, an expert in such matters, testified that the foreign pieces of wood found in the break were Norway pine. This incident is of not much importance of itself; but, considering that the crib was built of hemlock, and also considering that the course of the Prince was S. W. $^3/_4$ S., it is of certain corroborating influence. It might be that these pieces of wood were not picked up at the time of the striking, but they were offered by the libelant for this purpose; and inasmuch as there was no Norway pine in the crib, the Prince most probably did not strike the crib.

Now, the government engineer testifies that there were some pieces of pine timber used as floats anchored to some very large stones, so they would float partly upright for the stone boats to make fast to them when dumping riprap work over on the line of this extension work. They were located along on both sides of the extension work. They were about 12″x12″ timbers and about 12

feet long, held down by very heavy stones, some of them weighing several tons. Now, taking in consideration the course which Capt. Shay testified to, which was S. W. ³/₄ S. bearing upon the jumping jack light, that the foreign timber found in the break was pine, that the timber in the crib was hemlock, and that the crib was undamaged, there is more probability from this testimony that these timber floats off of the extension of the breakwater were struck than that the crib was struck.

Were this a lawsuit, instead of a proceeding in admiralty, a verdict based upon such proof could not be permitted to stand. This testimony, then, leaves it in doubt as to what caused the damage to the Prince. I understand it to be the rule in admiralty, as stated in Marsden's Collisions at Sea (6th Ed.) p. 29, that:

"To enable the plaintiff in a collision action to recover damages, he must prove affirmatively that his loss was caused by the negligence of the defendant, or of some person for whose acts he is liable. The general rule was thus stated by Lord Wensleydale: 'The party seeking to recover compensation for damage must make out that the party against whom he complains was in the wrong. The burden of proof is clearly upon him, and he must show that the loss is to be attributed to the negligence of the opposite party. If at the end he leaves the case in even scales, and does not satisfy the court that it was occasioned by the negligence or default of the other, he cannot succeed.'"

Now, considering all of the testimony in the case, which I have very briefly referred to, and the burden undoubtedly resting upon the libelant to show that the L. P. & J. A. Smith Company had control of the instrumentality which caused the damage to the Prince, and the preponderance of the testimony being found lacking in this regard, I think it unnecessary to inquire further into the questions involved in this disaster. I am unable to say that from the evidence I am persuaded more satisfactorily with the claim set up by the libelant than I am to the contrary.

The libelant having failed to show the responsibility of the L. P. & J. A. Smith Company for this disaster, the libel will be dismissed.